UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------
YASH KAMAT,

                    Plaintiff,

          -v-

LEAGUE NETWORK, PBC, a public benefit
corporation, ALLIANCE REENTRY
CENTERS, PBC, a public benefit corporation,
and JAY WHITEHEAD,

                    Defendants.
-------------------------------------------------
```

Civil Action No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff YASH KAMAT, for his complaint against LEAGUE NETWORK, PBC,

ALLIANCE REENTRY CENTERS, PBC and JAY WHITEHEAD, alleges as follows:

1.      Kamat is a citizen of India and legally resides in Issaquah, Washington.

Microsoft has employed Kamat as a Software Developer and then a Software Engineer for over

10 years.

2.      On information and belief, League Network is a Delaware public benefit

corporation with a principal place of business at 211 Warren Street, Newark, New Jersey 07103.

League Network, is a financial technology firm and purports to be "the home of America's 2 top

full-service fundraising apps."

3.      On information and belief, Alliance Reentry Centers is a Delaware public benefit

corporation with a principal place of business at 1616 5th Avenue North, Bessemer, Alabama

35020.   Alliance Reentry Centers assists individuals who have recently been released from

incarceration to successfully secure employment, housing, and financial services.

4.      Whitehead is an individual who, upon information and belief, resides in New

Jersey.   Whitehead is the Co-Founder and CEO of League Network at all relevant times and

became the Chairman and CEO of Alliance Reentry Centers when League Network was purchased by Alliance Reentry Centers.

5.        This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  This Court has supplemental jurisdiction over plaintiffs' state-law claims pursuant to 28 U.S.C. § l367(a) because they are related to plaintiffs Exchange Act claim, and they form part of the case or controversy.  This Court has also jurisdiction under 28 U.S.C. § 1332, as there is complete diversity of citizenship between the plaintiff and the defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.        Venue and personal jurisdiction in this Court are proper because the agreements between the parties require any litigation concerning the agreements to be filed in state or federal court in New York county and all parties have consented to venue and personal jurisdiction in this court.

FACTUAL BACKGROUND

7.        Kamat attended the Indian Institute of Technology, Madras from 2010-2014, earning a Bachelor of Technology degree in Computer Science

8.        Upon graduation, Microsoft hired Kamat as a Software Developer in Hyderabad, India from July 2014 to March 2016.

9.        In April 2016, Microsoft transferred Kamat from Microsoft India to Microsoft US by obtaining for Kamat an L1-B nonimmigrant visa.  L1-B visas are issued to "Intracompany Transferees with Specialized Knowledge."

10.       While working for Microsoft in Washington state, Kamat obtained an approved I-140 petition under the EB-3 category, reserved for Skilled or Professional Workers, with a

priority date of 06/23/2017. This is the first step for non-citizens to become Lawful Permanent Residents of the United States under the Employment Based visa category.

11.    While Kamat waited for the opportunity to finish the second step of his immigrant visa application, he moved from L1-B to H1-B nonimmigrant status in November 2020. H1-B status requires the visa holder to have a specialty occupation that requires a bachelor's degree or equivalent.

12.    Although Kamat has resided legally in the United States for many years, he wanted the opportunity to become a lawful permanent resident here through the USCIS's EB-5 Immigrant Investor Program.

13.    The EB-5 program—officially known as the "Employment-Based Immigration: Fifth-Preference program"—is a United States immigration program that permits foreign investors to obtain Lawful Permanent Residency by investing a certain sum of money in a United-States business that creates and sustains a certain number of jobs in designated areas in need of economic stimulus and high unemployment.

14.    Kamat was offered an EB-5 investment opportunity by defendant League Network.

15.    The investment opportunity was presented to Kamat in a document entitled "Subscription Agreement."

16.    In exchange for an investment of $500,000 in League Network, Kamat became the owner of 115,931 shares of League Network Series EB-5 Preferred Stock. The subscription was signed on August 31, 2021, and Kamat paid $500,000 to League Network.

17.    Kamat was induced to enter into the subscription agreement by misrepresentations made by League Network in the Subscription Agreement and the Supplemental

Disclosure and Business Plan League Network provided to him.  Kamat also relied on oral misrepresentations made to him by Whitehead before he signed the Subscription Agreement.

18.     In particular, the written documents and Whitehead assured Kamat that his investment would satisfy the USCIS requirements for the issuance of an EB-5 visa.  These representations were false for reasons discussed below:

    a.  League Network told Kamat that his investment would be part of an investment into Newark, New Jersey, a Targeted Employment Area ("TEA") and, therefore, satisfy the TEA requirement for the issuance of an EB-5 visa.  At the time it made this statement, League Network relied on an outdated TEA letter that would not be accepted by the USCIS.

    b.  League Network told Kamat that it was a financial technology business developing a fundraising application, or platform, that would be used by youth sports teams. League Network also said that its application was also proving useful in the dental services market.  League Network would develop its application and provide its services its headquarters at the New Jersey Institute of Technology's business incubator site at 211 Warren Street, in Newark, New Jersey.

    c.  At the same time League Network was soliciting Kamat and other potential investors to make EB-5 investments in League Networks, the company was working on a transaction under which it would sell itself to Alliance Reentry Centers in Bessemer, Alabama.  Alliance Reentry Centers helps inmates newly released from prison integrate back into society.  At the time it entered negotiations with League Network, Alliance Reentry Centers owned approximately 15 residency facilities for the newly release prisoners.

d.  Alliance Reentry Centers became interested in League Network because of the technology League Network owned and was developing. The company believed League Network's application could be modified to further its mission of helping the newly released prisoners.

e.  Alliance Reentry Centers modified League Network's application to become ReentryPay.com, which was the first-ever online bank for reentrants, and ReentryApp which was used to track the reentrants and connect them with their parole officers. According to one report, with the acquisition of League Network, Alliance Reentry Centers became the facilities and technology "leader in the multi-billion dollar reentry market."

f.  Upon its acquisition by Alliance Reentry Centers, all of League Network's initial investors became shareholders in Alliance Reentry Centers. More importantly, however, League Network's Chief Executive Officer, defendant Whitehead, became the Chief Executive Officer and Chairman of Alliance Reentry Centers. Additionally, Rich Haggerty became Alliance Reentry Centers' Product Director, responsible for the company's web and mobile native application developments and product adoption. Mr. Haggerty served a similar role at League Network, and he was also one of the League Network's original employees.

g.  When the sale to Alliance Reentry Centers was finalized, League Network's business plan became obsolete. Rather than working in Newark with youth leagues and dentists, League Networks was now focused on helping newly released prisoners in Alabama obtain bank accounts, jobs and phones and helping their parole officers keep track of their charges. Rather than create jobs in Newark, New

Jersey, the acquisition subtracted at least two jobs from Newark.  The addition of two jobs in Bessemer, Alabama did not impress the USCIS.

h.  When it solicited and accepted Kamat's investment, League Network knew that its operations were about to change dramatically, it would lose key personnel, and it would no longer satisfy the Capital at Risk requirement for the issuance of an EB-5 visa.

i.  The EB-5 investment must be used to create at least 10 new jobs.  If the jobs have not been created at the time of the investment the business plan must establish that significant steps are planned and are being implement so that it is obvious that the new business will create at least 10 new jobs.  Such a business plan is said to be "*Matter of Ho* Compliant."  League Network made representations to Kamat that its business plan would be *Matter of Ho* Compliant.  However, because of the sale to Alliance Reentry Centers, the plan was not compliant and would never be compliant.

19.  At the time he made his investment, Kamat did not know that League Network was in negotiations with Alliance Reentry Centers.

20.  Using the materials provided by League Network and material created by his own immigration lawyers, Kamat duly filed an I-526 visa application on September 30, 2021. The United States Citizenship and Immigration Services denied that application on July 12, 2024, because the USCIS determined that the requirements of the EB-5 program were not, and could not, be satisfied.  Kamat spent at least $30,000 in legal and administrative fees and other costs associated with his application for an EB-5 visa.

21.      In its Notice of Intent to Deny, the USCIS explained the problem with Kamat's

application for an EB-5 visa as follows:

> The Business Plan indicates that Petitioner's investment will be
> provided to [League Network] in order to develop and support
> fundraising activities in the youth sports team market and dental
> services market.
>
> However, open source information indicates that the parent
> company of the NCE was purchased by ReentryCenters.com,
> which "helps newly released prisoners obtain necessities such as
> bank accounts, jobs and phones." According to *IssueWire*, "Under
> the terms of the stock purchase, League Network PBC becomes a
> wholly-owned subsidiary of Alliance Reentry Centers PBC Inc."
>
> While the article goes on to state that EB-5 Investors will maintain
> their investment in League Network PBC, the business activity of
> [League Network] will no longer be the activity specified in the
> business plan, nor that which Petitioner claimed would create the
> required jobs at the time of filing.
>
> "[a] petitioner must establish eligibility at the time of filing; a
> petition cannot be approved at a future date after the petitioner
> becomes eligible under a new set of facts. See Matter of Katigbak,
> 14 I&N Dec. 45, 49 (Comm. 1971). Therefore, a petitioner may
> not make material changes to a petition that has already been filed
> in an effort to make an apparently deficient petition conform to
> [USCIS] requirements." *Matter of Izummi*, 22 I&N Dec. 169, 175
> (Assoc. Comm'r 1998); see also 8 C.F.R. § 103.2(b)(l).

Notice of Intent to Deny, May 14, 2024.

22.      The USCIS denied Kamat's application for an EB-5 visa.

23.      Upon the denial of his application, Kamat demanded the return of his investment

from League Network, Alliance Reentry Centers and Whitehead.   In exchange for Kamat's

agreement not to file suit against them and promise to surrender his EB-5 preferred shares, League

Network and Alliance Reentry Centers agreed to reverse the transaction and repay Kamat his

investment in full.  The parties reduced their agreement to a writing dated January 1, 2025.  Under

the Settlement Agreement, Alliance Reentry Centers signed a promissory note issued January 1,

2025 that requires it to pay Kamat $500,000 as follows: $125,000.00 on February 28, 2025, April 30, 2025, June 30, 2025, and August 31, 2025.

24.     To date, neither League Network nor Alliance Reentry Centers have made a single payment to Kamat.

25.     Kamat continues his efforts to obtain an EB-5 visa and is researching available investments. However, the minimum investment amount for the program Kamat is using has been increased to $800,000. When Kamat made his investment with League Network, the minimum investment in the program was $500,000.

### FIRST CLAIM FOR RELIEF-SECURITIES FRAUD
**against League Network and Whitehead**
**(Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5)**

26.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 25 as if set forth fully herein.

27.     The EB-5 Preferred shares Kamat purchased under the Subscription Agreement are securities under the law.

28.     Defendant League Network and Whitehead worked together to solicit Kamat as an investor in the EB-5 preferred shares.

29.     The Subscription Agreement, Disclosure Statement and Business Plan issued by League Network contained material misstatements of fact relating to the nature of the investment and its ability to satisfy the requirements of the USCIS EB-5 program.

30.     Defendant Whitehead's oral representations to Kamat misrepresented the nature of the investment and its ability to satisfy the requirements of the USCIS EB-5 program.

31.     When they issued and presented the written material and made oral statements to Kamat, defendants League Network and Whitehead knew that the information contained therein was false in material respects.

32.     League Network and Whitehead never disclosed the fact that they were negotiating a sale of the company to Alliance Reentry Centers.  Any sale of the company or its technology would make it make it impossible for Kamat to obtain an EB-5 visa through the program offered by League Network and Whitehead.

33.     Because of the sale negotiations and the age of many of the materials, the program offered by the Subscription Agreement lacked many of the attributes necessary for the issuance of an EB-5 visa.

34.     Defendant League Network and Whitehead made the written and oral misrepresentations to Kamat knowing they were false and misleading in that critical information was not disclosed, including the sale negotiations and the age of the material.

35.     Defendant League Network and Whitehead made the written and oral misrepresentations to Kamat to induce him to purchase the EB-5 shares.

36.     Kamat reasonably relied on the representations defendants made in the written materials and communications and made an investment of $500,000.00 with League Network to purchase the EB-5 shares.

37.     Using the investment materials from League Network, Kamat spent at least $30,000 in legal and administrative fees and other costs associated with his application for an EB-5 visa.

38.     If the written materials and oral communications from League Network and Whitehead did not contain the numerous material representations cited above, Kamat would have never invested in League Network's EB-5 program.

39.     By making material misrepresentations while selling a security, defendants League Network and Kamat violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, I7 C.F.R. § 240.10b-5(b).

40.     As a direct result of Kamat's reliance on defendants' misrepresentations, Kamat was injured in an amount to be proved at trial but exceeding $530,000.00 plus the additional $300,000 that must be invested to qualify for the EB-5 program under the current regulations.

## SECOND CLAIM FOR RELIEF- BREACH OF CONTRACT
### against League Network and Alliance Reentry Centers

41.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 40 as if set forth fully herein.

42.     Kamat, on the one hand, and League Network and Alliance Reentry Center, on the other hand, entered into a Settlement Agreement under which League Network and Alliance Reentry Center were required to pay Kamat $500,000.  Alliance Reentry also issued a Promissory Note to Kamat documenting the promise to pay Kamat $500,000.  The Settlement Agreement and Promissory Note are attached hereto as Exhibit A, the "Settlement Agreement" and Exhibit B, the "Promissory Note."

43.     Kamat has fulfilled all his obligations under the parties' agreements.

44.     League Network and Alliance Reentry Centers breached their obligations under the written by not making any of the payments required thereunder.  Alliance Reentry Centers defaulted on its obligations under the Promissory Note.

45.     Kamat has made multiple demand for payment.

46.     As a direct and proximate result of League Network's and Alliance Reentry Center's breach of the Settlement Agreement and Promissory Note, Kamat has been damaged in an amount to be determined at trial but more than $500,000.

### THIRD CLAIM FOR RELIEF – COMMON LAW FRAUD
**against League Network and Whitehead**

47.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 46 as if set forth fully herein.

48.     League Network and Whitehead made material written and oral false representations to Kamat, to induce him to invest in their EB-5 preferred shares program.

49.     When they made their misrepresentations to Kamat, League Network and Whitehead knew that they were false because they knew the program being offered was deficient in several key requests and could not satisfy the requirements of the USCIS EB-5 program.

50.     League Network and Whitehead intended for Kamat to rely on their misrepresentations when considering investing in the League Network EB-5 program.

51.     Kamat reasonably relied on League Network's and Whitehead's materially false representations, and, because of those misrepresentations, he invested $500,000 in League Network's EB-5 program and spent in excess of $30,000 in legal and administrative fees and other costs associated with his application for an EB-5 visa.

52.     As a result of his reliance on League Network's and Whitehead's misrepresentations, Kamat was damaged in an amount to be proven at trial, but more than $530,000, plus the additional $300,000 that must be invested to qualify for the EB-5 program under the current regulations.

## <u>FOURTH CLAIM FOR RELIEF – NEGLIGENT MISREPRESENTATION</u>
### against League Network and Whitehead

53.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 52 as if set forth fully herein.

54.     League Network and Whitehead made material factual misrepresentations to Kamat concerning the EB-5 investment and its ability to satisfy USCIS requirements for the issuance of an EB-5 visa.

55.     When League Network and Whitehead made these misrepresentations, they were negligent in not knowing that the statements were false and misleading, and the EB-5 investment would not satisfy USCIS requirements.

56.     League Network and Whitehead made these misrepresentations in the course of their business dealings with Kamat, where they had a duty to provide accurate information, and Kamat foreseeably relied on these misrepresentations to invest $500,000 in League Network.

57.     Kamat reasonably relied on defendants' misrepresentations and paid $500,000 to purchase the EB-5 preferred shares offered by League Network and spent in excess of $30,000 on legal fees and application and other costs fruitlessly applying for an EB-5 visa.

58.     As a direct result of Kamat's reliance on defendants' negligent misrepresentations, Kamat been damaged in an amount to be proven at trial, but more than $530,000.00, plus the additional $300,000 that must be invested to qualify for the EB-5 program under the current regulations.

**WHEREFORE**, plaintiff demands judgment in his favor and against the defendants as follows:

a). On all the First, Third and Fourth Claims for Relief, for an award of compensatory damages against defendants League Network and Whitehead in an amount to be proven at trial, but more than $830,000, plus interest thereon;

b). On the Second Claim for Relief, an award of compensatory damages against all defendants in an amount to be proven at trial, but more than $500,000;

c.) On the First, Third and Fourth Claims for Relief, for an award of statutory penalties and/or punitive damages against League Network and Whitehead; and

d). On all claims for Relief, an award of statutory and/or contractual attorney's fees, costs of suit, interest and such other and further relief as this Court deems just and proper.

<u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 21, 2025                    Respectfully submitted,


                                         GIGIO K. NINAN, ESQ.
                                         SHANKAR NINAN & CO. LLP
                                         505 8th Avenue, Rm 1801
                                         New York, New York 10018
                                         Telephone (212) 594-6657, ext 215
                                         Email  gio@shankarninan.com

                                         JOHN F. OLSEN, ESQ.
                                         THE LAW OFFICE OF JOHN F. OLSEN, LLC
                                         105 Grove Street, Suite 6
                                         Montclair, New Jersey 07042
                                         Telephone (973) 932-0474
                                         Email jolsen@jfolsenlaw.com

                                    By  *John F. Olsen*
                                        _____
                                        John F. Olsen

                                        *Co-Counsel for Plaintiff, Yash Kamat*

EXHIBIT A

# AGREEMENT

This Agreement (the "Agreement") is entered into as of this **1** day of January 2025 between Yash Kamat ("Kamat"), an individual, League Networks, PBC ("LN"), a Delaware public benefit corporation and Alliance Reentry Centers, PBC ("Alliance"), a Delaware public benefit corporation. Kamat, LN and Alliance will each be referred to as a "Party" and will be referred to together as the "Parties."

WHEREAS, LN and Kamat entered into a valid, binding agreement evidenced by documentation including, but not limited to a Subscription Agreement and an Adoption Agreement (the "Transaction") pursuant to which Kamat purchased 115,931 shares of Series EB-5 Preferred Stock of LN (the "Preferred Stock") for a purchase price of $500,000.00 (the "Purchase Price");

WHEREAS, the intent of the Transaction was to enable Kamat to apply for and hopefully obtain an EB-5 visa from the United States U.S. Citizenship and Immigration Services ("USCIS");

WHEREAS, Kamat filed an application for an EB-5 visa from USCIS (the "Application");

WHEREAS, the Application was denied;

WHEREAS, Kamat and LN wish to reverse the Transaction, LN wishes to return to Kamat the Purchase Price and Kamat wishes to surrender to LN the Preferred Stock; and

WHEREAS, the Parties have agreed to resolve all disputes relating to the Transaction and all other claims Kamat may have against LN or Alliance or LN and Alliance may have against Kamat as of the Execution Date of this Agreement;

NOW THEREFORE, the Parties agree as follows:

## 1.    BINDING AGREEMENT UPON EXECUTION.

This Agreement is binding on the Parties as of the date on which the last Party to execute this Agreement has executed the Agreement and provided its or his signature page to the other Parties ("Execution Date").

## 2.    SETTLEMENT PAYMENT.

LN and Alliance shall cause the Purchase Price to be returned to Kamat pursuant to the terms set forth in the promissory note (the "Note") annexed hereto as Exhibit A. For the avoidance of doubt, the total amount to be paid to Kamat pursuant to this Agreement is $500,000. Payments shall be made by wire transfer to Kamat through counsel using the following wire instructions:

Receiver Bank Name: First Capital Bank
Receiver Bank Address: 909 S. Main Street, Laurinburg, North Carolina 28352
Receiver Bank ABA: 053274061
Beneficiary Name: Banias Law LLC IOLTA Account
Beneficiary Address: 5 Sutherland Avenue, Charleston, South Carolina 29403
Beneficiary Account Number: 1003005087

3.    **SURRENDER OF PREFERRED STOCK**

In exchange for the Settlement Payment and Note and the other consideration provided for in this Agreement, Kamat hereby surrenders the Preferred Stock, and the Preferred Stock shall be deemed surrendered upon Kamat's execution of this Agreement.

4.    **FOREBEARANCE/RELEASE.**

On the date this Agreement is executed by the last Party to execute the Agreement (the "Execution Date"), Kamat shall discontinue, withdraw and/or terminate any claim, action or proceeding of any type asserted against LA, Alliance and their owners, members, partners, managers, officers, directors, investors, lenders, attorneys, employees and agents, including specifically, but not limited to Jay Whitehead, Sam Udani and Shrikant Rangnekar (the "LA/Alliance Released Parties") and the LA/Alliance Released Parties shall discontinue, withdraw and/or terminate any claim, action or proceeding of any type asserted against Kamat and each of his trustees, beneficiaries, heirs, executors, administrators, successors, assigns, insurers, representatives, agents, advisors, attorneys, administrators, heirs, executors, trusts, trustees, beneficiaries and immediate family members (the "Kamat Released Parties"). Beginning on the Execution Date and for as long as the payments required by Section 2 hereof and the Note are timely made, Kamat shall forebear from bringing any claim, action or proceeding of any type against the LN/ Alliance Released Parties and LN and Alliance shall forebear from bringing any claim, action or proceeding against the Kamat Released Parties.

Effective upon the payment of the Final Payment the Kamat Released Parties hereby irrevocably remise, release and forever discharge the LA/Alliance Released Parties, of and from any and all manner of actions, causes of action, suits, contracts, claims, damages, costs and expenses of any nature or kind whatsoever, whether in law or in equity, that the Kamat Releasing Parties had, have or may have, except for obligations arising under this Agreement (the "Kamat Released Claims").

Effective upon the payment of the Final Payment the LA/Alliance Released Parties hereby irrevocably remise, release and forever discharge the Kamat Released Parties of and from any and all manner of actions, causes of action, suits, contracts, claims, damages, costs and expenses of any nature or kind whatsoever, whether in law or in equity, that the LA/Alliance Released Parties had, have or may have, except for obligations arising under this Agreement (the "LA/Alliance Released Claims").

5.    **NOTICES.**

All notices required under this Agreement shall be in writing, and shall be (i) personally delivered or (ii) sent by recognized national overnight carrier (postage prepaid), and shall be effective as of (i)  the date on which personally delivered, or (ii) the next business day after the day it is presented to a recognized overnight carrier (postage prepaid), addressed to a Party at its respective address set forth in this Section 9, or to any other address which the Party may from time to time designate in writing as an address for the purpose of notice in the manner prescribed herein.

Notices shall be delivered as follows:

**If to Kamat:**

Yash Kamat
c/o Banias Law, LLC
602 Rutledge Avenue
Charleston, SC 29403

**If to LN or Alliance:**

Jerry Washburn
Chairman of the Executive Committee
Alliance Reentry Centers PBC Inc.
1616 5th Avenue N
Bessemer, AL 35020

6.    **GENERAL PROVISIONS**

**6.1 Assignment.**  Neither this Agreement nor any rights or obligations in it or created by it shall be assigned or transferred by any Party, directly or indirectly, in whole or in part, by operation of law or otherwise, without the prior written consent of every other Party.  Any attempted assignment without such consent shall be void.  The Parties each represent and warrant to one another that they have not assigned any claim, debt, liability, demand, obligation, cost, expense, action, or cause of action that is the subject of or released in this Agreement to any other person or entity.

**6.2 Binding Effect.**  This Agreement will be binding upon and inure to the benefit of all Parties and each of their or his respective (as applicable) agents, spouses, children, heirs, trustees, executors, beneficiaries, administrators, representatives, successors, parents, affiliated and subsidiary entities and divisions, commonly controlled entities, attorneys, representatives and assigns.

**6.3 Drafting.**  This Agreement is a negotiated document and shall be deemed to have been drafted jointly by the Parties, and no rule of construction or interpretation shall apply against any particular Party based on the contention that this Agreement was drafted by one of the Parties.

**6.4 Execution In Counterparts.**  This Agreement may be executed in multiple counterparts and transmitted by facsimile or by electronic mail or by any other electronic means intended to preserve the original graphic and pictorial appearance of a Party's signature, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**6.5 Headings.**  The section headings of this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement or affect in any way its meaning or construction.

**6.6  Waiver.**  No waiver of any provision of this Agreement may be deemed, or will constitute, a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

**6.7 Applicable Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to choice of law principles.

**6.8 Consent to Jurisdiction.**  Any actions arising out of or relating to this Agreement shall be heard and determined exclusively in any state or federal court located in the State of New York, New York County.  The Parties hereby submit to the exclusive jurisdiction of the above-named state or federal courts for the purpose of any action arising out of or relating to this Agreement brought by any Party hereto.  The Parties hereby consent to the service of any process or paper relating to any proceeding in the aforementioned fora by certified mail, return receipt requested or the equivalent at the address set fort for the applicable party in Section 4 hereof in lieu of any form of service required by the rules otherwise applicable to such fora.  Nothing herein shall prevent or invalidate service of any process or paper via any other means provided for by law or court rule.

**6.9  Entire Agreement.**  This Agreement and the Note annexed hereto as Exhibit A constitute the entire agreement and understanding between the Parties with respect to the subject matter and the transactions contemplated hereby, and supersedes any and all prior representations, agreements, understandings, negotiations and discussions, whether written or oral, of the Parties.  No Party is relying on any promise, representation, inducement, or statement of any Party except as expressly set forth in this Agreement.  Any modification to this Agreement must be made in writing and signed by all Parties.

IN WITNESS WHEREOF, the undersigned have caused this Settlement Agreement and Release to be executed this 1st Day of January 2025 (the "Execution Date") on due authority.

Dated:  12 / 28 / 2024

**YASH KAMAT**

_Yash Kamat_

Dated:  12/31/2024

**LEAGUE NETWORKS, PBC**

By:
Title:

Dated:  12/31/2024

**ALLIANCE REENTRY CENTERS, PBC**

By:
Title:

EXHIBIT B

# PROMISSORY NOTE

**Date of Issuance**

**US$500,000**                                                        January__1_, 2025

      **FOR VALUE RECEIVED**, Alliance Reentry Centers PBC Inc., a Delaware public benefit corporation (the "**Company**"), hereby promises to pay to the order of Yash Kamat, (the "**Holder**"), the sum of US$500,000 (the "**Principal Amount**") on the terms set forth in this promissory note (this "**Note**").  Company and Holder are referred to herein as the "Parties" and individually as a "Party."

      1.    <u>Payment</u>. All payments will be made in lawful money of the United States of America via wire payment using the following wiring instructions:

          Receiver Bank Name: First Capital Bank
          Receiver Bank Address: 909 S. Main Street, Laurinburg, North Carolina 28352
          Receiver Bank ABA: 053274061
          Beneficiary Name: Banias Law LLC IOLTA Account
          Beneficiary Address: 5 Sutherland Avenue, Charleston, South Carolina 29403
          Beneficiary Account Number: 1003005087

or at such other place as the Holder may from time to time designate in writing to the Company in the following amounts on the following schedule:

      (a) a payment of $125,000.00 on or before February 28, 2025;

      (b) a payment of $125,000.00 on or before April 30, 2025;

      (c) a payment of $125,000.00 on or before June 30, 2025;

      (d) a payment of $125,000.00 on or before August 31, 2025.

      2.    <u>Security</u>. This Note is a general unsecured obligation of the Company.

      3.    <u>Representations and Warranties of the Company</u>. In connection with the transactions contemplated by this Note, the Company hereby represents and warrants to the Holder as follows:

      3.1    <u>Due Organization; Qualification and Good Standing</u>.  The Company is a public benefit corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted.  The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify or to be in good standing would have a material adverse effect on the Company.

      3.2    <u>Governmental Consents</u>.  All material consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority or other party required on the part of the Company in connection with issuance of this Note has been obtained.

3.3     Authorization and Enforceability. All corporate action has been taken on the part of the Company and its officers, directors and stockholders necessary for the authorization, execution and delivery of this Note.

4.     Representations and Warranties of the Holder. In connection with the transactions contemplated by this Note, the Holder hereby represents and warrants to the Company as follows:

4.1     Authorization. The Holder has full power and authority (and, if an individual, the capacity) to enter into this Note and to perform all obligations required to be performed by it hereunder. This Note, when executed and delivered by the Holder, will constitute the Holder's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

4.2     Residence.  Holder is an individual and resides in the state or province identified in the address shown on the Holder's signature page hereto.

5.     Events of Default.

5.1     If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Holder and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (b) or (c) below), this Note shall accelerate and all principal shall become immediately due and payable.  The occurrence of any one or more of the following shall constitute an "Event of Default":

(a)     The Company fails to pay timely any amount due under this Note on the date the same becomes due and payable;

(b)     The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing;

(c)     An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company); or

(d)     The Company fails to observe or perform any other covenant, obligation, condition or agreement contained in this Note, and such failure continues for 10 business days after the Company's receipt of written notice of such failure.

5.2     In the event of any Event of Default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by the Holder in enforcing and collecting this Note.

6.     Miscellaneous.

6.1     Successors and Assigns.  The terms and conditions of this Note will inure to the

benefit of, and be binding upon, the respective successors and permitted assigns of the parties; provided, however, that neither the Company nor the Holder may assign its rights and/or obligations under this Note without the written consent of the other Party. This Note is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Note.

6.2    <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

6.3    <u>Consent to Jurisdiction</u>. Any actions arising out of or relating to this Note shall be heard and determined exclusively in any state or federal court located in the State of New York, New York County. The Parties hereby submit to the exclusive jurisdiction of the above-named state or federal courts for the purpose of any action arising out of or relating to this Agreement brought by any Party hereto. The Parties hereby consent to the service of any process or paper relating to any proceeding in the aforementioned fora by certified mail, return receipt requested or the equivalent at the address set fort for the applicable party in the signature blocks to this Note in lieu of any form of service required by the rules otherwise applicable to such fora. Nothing herein shall prevent or invalidate service of any process or paper via any other means provided for by law or court rule.

6.4    <u>Counterparts</u>. This Note may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.5    <u>Titles and Subtitles</u>. The titles and subtitles used in this Note are included for convenience only and are not to be considered in construing or interpreting this Note.

6.6    <u>Notices</u>. All notices and other communications given or made pursuant hereto will be in writing and will be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by confirmed email if sent during normal business hours of the recipient, if not, then on the next business day; (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the respective parties at the addresses shown on the signature pages hereto (or to such email address, facsimile number or other address as subsequently modified by written notice given in accordance with this Section 6.6).

6.7    <u>Expenses</u>. Each party will pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Note.

6.8    <u>Entire Agreement; Amendments and Waivers</u>. This Note and the Settlement and Release Agreement between the Parties to which this is annexed as Exhibit A constitute the full and entire understanding and agreement between the parties with regard to the subject hereof.

Any term of this Note may be amended and the observance of any term may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Parties.

6.9    Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provisions will be excluded from this Note and the balance of the Note will be interpreted as if such provisions were so excluded and this Note will be enforceable in accordance with its terms.

6.10    Officers and Directors not Liable. In no event will any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

6.11    Approval. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Note.

6.12    Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER REPRESENTS AND WARRANTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

LEAGUE NETWORK PBC

By:

Name: Jay Whitehead
Title:  CEO
Address:  1616 5th Avenue N, Bessemer, AL 35020
Email Address:  jay@reentrycenters.com

**Agreed to and accepted:**

Name: Yash Kamat

Address:  1678 NE FALLS DR, ISSAQUAH, WA 98029

Email Address:  yashvkamat@gmail.com

**Dropbox Sign**

Audit trail

| | |
|---|---|
| **Title** | Settlement Agreement |
| **File name** | Final_Final_Kamat_Agreement.pdf |
| **Document ID** | ed9964230d3bbbafc48a9545012cfdf10b1302e3 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SENT**
**12 / 28 / 2024**
16:02:00 UTC-5

Sent for signature to Yash Kamat (yashvkamat@gmail.com) from brad@baniaslaw.com
IP: 108.94.155.183

**VIEWED**
**12 / 28 / 2024**
16:02:15 UTC-5

Viewed by Yash Kamat (yashvkamat@gmail.com)
IP: 172.56.106.212

**SIGNED**
**12 / 28 / 2024**
16:07:25 UTC-5

Signed by Yash Kamat (yashvkamat@gmail.com)
IP: 172.56.106.212

**COMPLETED**
**12 / 28 / 2024**
16:07:25 UTC-5

The document has been completed.

Powered by **Dropbox Sign**